# IN THE UNITED STATES COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA  RECEIVED
### SOUTHERN DIVISION

2007 FEB 27  A 11: 40

INTERNATIONAL ASSOCIATION OF )  ░░A P. HACKETT, ░░░
MACHINISTS AND AEROSPACE )  U S. DISTRICT COURT
WORKERS, LOCAL LODGE 1632, )  MIDDLE DISTRICT ALA
)
    **Plaintiff,** )
)    Civil Action No. 1 07-CV-174-WKW
**v.** )
)
**PEMCO WORLD AIR SERVICES, INC.,** )
)
)
    **Defendant.** )

## COMPLAINT

This is a suit, pursuant to Section 301(a) of the Labor Management Relations Act, 29

U.S.C.§185(a), to enforce an arbitration award.

## JURISDICTION AND VENUE

1.    Jurisdiction for this action to enforce the terms of a contrct exists under Section

301(a) of the Labor Management Relations Act, 29 U.S.C. §185(a).  Venue for

this action exists in this Court pursuant to Section 301(c), 29 U.S.C. §185(c),

because Defendant Pemco World Air Services maintains an office within the

Court's territorial jurisdiction, and because authorized agents of Plaintiff

International Association of Machinists and Aerospace Workers, Local Lodge

1632 are engaged in representing employees within the Court's

jurisdiction.(Dothan, Houston County, Alabama)

## PARTIES

2.    Plaintiff Local 1632 ("Local 1632" or "the Union") is a labor organization headquartered in Dothan, Houston County, Alabama and is a "labor organization" as that term is defined in Section 2(5) of the Labor Management Relations Act as amended, 29 U.S.C. §152(5).

3.    Local 1632 is the exclusive collective bargaining representative of certain of the employees of the Pemco World Air Services in Dothan, Houston, County, Alabama, pursuant to Section 9(a) of the National Labor Relations Act, 29 U.S.C. §159(a).

4.    Defendant Pemco World Air Services Inc.("Pemco") is an "employer" within the meaning of Section 2(2) of the Labor Management Relations Act, as amended, 29 U.S.C. §152(2), and its place of business is in Dothan, Houston County, Alabama, and is "an industry affecting interstate commerce," within the meaning of Sections 2(6) and 2(7) of the National Labor Relations Act, as amended, 29 U.S.C. §§152(6),(7).

## BACKGROUND FACTS

5.    At all material times herein, Local 1632 and the Penco have been parties to a Collective Bargaining Agreement .(CBA).

6.    Article VIII of the CBA sets forth a multi-step grievance procedure for the settlement of disputes between Local 1632 and Pemco which culminates in final and binding arbitration.

7.    Under Article IV, Section 3(A) of the CBA, an employee must serve a 90-day

continuous service probationary period before he or she acquires seniority and rights attendant thereto under the CBA.

8.    Article IV, Section 3 (B) further provides:

> "In the event, however, that a probationary employee is rehired within ninety (90) days after separation, he will receive credit for his previous length of continuous service as probationary employee, provided said probationary employee worked at least one (1) month prior to said termination in the same occupational group that he is placed in at rehire."

9.    On June 1, 2004 Local 1632 filed a grievance alleging that Pemco was violating the CBA by failing to grant seniority under the Article IV of the CBA to employees referred to by the Arbitrator as "temporary contract employees obtained from agencies called contract houses" who had worked for 90 days pursuant to Article IV, Sections 3(B) and (C).  When the grievance could not be resolved it was referred to arbitration.

10.    On March 9, 2005 a hearing was held before Arbitrator Trevor Bain at which time each both Pemco and the Union  were afforded an opportunity to call witnesses and present other evidence and argument.

.11.    On April 26, 2005 the Arbitrator issued an opinion and award sustaining the Union's grievance and finding that the provisions of Article IV applied to temporary contract employees.

12.    A true and correct copy of the Arbitrator's opinion and award is attached hereto as Exhibit A.

3

13.  The Defendant Pemco has in bad faith failed and refused to abide by the Opinion and Award of the Arbitrator despite repeated demands by the Union that Pemco do so.  .

## COUNT 1

14.  Plaintiff hereby incorporates paragraphs 1-13 by reference herein.

15.  By failing and refusing to abide by the Arbitrator's final and binding Opinion and Award, Defendant is breaching its contractual obligations to the Union.

16.  There is no adequate remedy at law for the Defendant's contractual violation other than specific performance of their obligation to abide by the Arbitrator's final and binding  Opinion and Award..

WHEREFORE, Plaintiff Local 1632 prays:

A.  That this Court issue an order compelling Defendant Pemco to abide by the Arbitrator's Opinion and Award;

B  That Local 1632 awarded its costs of this suit;

C  That Local 1632 be awarded its reasonable attorney fees; and

D.  That this Court award such other and further relief as it deems just and proper.

Respectfully submitted,

Patrick K. Nakamura, Esq.
Alabama Bar No. ASB-1814-A64P

4

**NAKAMURA, QUINN & WALLS LLP**
Lakeshore Plaza, Suite 130
2204 Lakeshore Drive
Birmingham, AL 35209-6701
Telephone 205-802-1495
Facsimile  205-803-4143


Address of Plaintiff

International Association of Machinists and
   Aerospace Workers, Local Lodge 1632
127 Industrial Drive
Dothan, AL 36303

Address of Defendant

Pemco World Air Service Inc.
100 Pemco Drive
Dothan, AL 36303

Registered Agent          :

Doris K. Sewell
1943 50th St. North
Birmingham, AL 35212

IN THE MATTER OF THE ARBITRATION BETWEEN

INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS, LOCAL LODGE 1632

AND

PENCO WORLD AIR SERVICES

*FNCS CASE NO: 04-07799
*
*GRIEVANCE:   SENIORITY,
             PROBATIONARY
             EMPLOYEES
             POLICY
*
* GRIEVANT:    IAM, LOCAL
              LODGE 1632
*

1:07-CV-174-WKW



## **OPINION AND AWARD**

ARBITRATOR:  TREVOR BAIN

AWARD DATE:  April 26, 2005


APPEARANCES FOR THE PARTIES


INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS,
LOCAL LODGE 1632

Steve Pridgen, Business Representative, District Lodge 75

Danny Dossett, Chief Steward

Janet Dawkins, Shop Steward

Wilton Morgan

PEMCO WORLD AIR SERVICES

Stephen Brown, Attorney

James Battcher, Director, Human Resources

## PROCEDURAL HISTORY

International Association of Machinist and Aerospace Workers, Local Lodge 1632 is herein referred to as "Union." PEMCO World Air Services is herein referred to as "Company."

A written grievance was filed by the Union on June 1, 2004 (Joint Exhibit No. 2). As explained more fully hereinafter the present grievance objected to the Company's violation of Article IV, seniority of probationary employees. Following unsuccessful attempts at resolving the grievance it was referred to arbitration in accordance with Article VIII of the Agreement, hereinafter, "Agreement." Trevor Bain was appointed as the Arbitrator.

An arbitration hearing was held at the Comfort Inn, Dothan, Alabama, on March 9, 2005. During the course of the hearing, both parties were afforded full opportunity for the presentation of evidence, examination and cross-examination of witnesses, and oral arguments. The parties agreed that the grievance was timely. The parties elected to file post-hearing briefs, to be exchanged through the Arbitrator, postmarked by April 11, 2005. The Arbitrator received both briefs on April 12, 2005 and exchanged the briefs.

**PERTINENT PROVISIONS OF THE AGREEMENT**

**BETWEEN THE PARTIES**

**FIRST EFFECTIVE AUGUST 19, 2000**

**ARTICLE IV**

**SENIORITY**

Section 1.

(A)  Seniority shall be deemed to consist of length of continuous service with the Company.  In the application of the principles of seniority as provided in this agreement, the employees involved must have the ability, physical fitness, efficiency, dependability and be qualified to perform the work involved.  The Company, in the application of seniority principles, will give preference to length of continuous service if the other factors are substantially equal.

.  .  .

Section 2.

Length of service in connection with an employee's seniority shall be computed from the first date of hire except that if there has been a break in his continuous service record as provided in this agreement.  Seniority then will be computed from the last date of rehire or return.

Section 3.

(A)  A new employee and one who shall be re-employed after a break in his continuous service shall not acquire any seniority under this agreement until the expiration of the period of ninety (90) days of continuous service following employment.  If such employee shall be continued in the employ of the Company after the expiration of such ninety (90) day period, the length of continuous service shall be computed from the date of employment or re-employment in accordance with the applicable provisions of the agreement.  Any separation of employment during said ninety (90) day probationary period shall not be made the basis of a claim or grievance against the Company and there shall be no obligation to re-employ such person, provided, however, that this provision will not be used for the purpose of discrimination because of membership in the Union.

(B)  In the event, however, that a probationary employee is rehired within ninety (90) days after separation, he will receive credit for his previous length of continuous service as probationary employee, provided said probationary employee worked at least one (1) month prior to said termination in the same occupational group that he is placed in at rehire.

(C)  If a probationary employee is granted a leave of absence or is absent in excess of five (5) work days during the

4

probationary period, the effective date of acquiring seniority
may be postponed by a period of time no longer than the employee
has been absent or on leave.

. . .

### Article VIII

#### ARBITRATIONS

. . .

(c) The Arbitrator shall consider only those issues,
including any amendments that were made pursuant to Section 4 of
Article VII, which have been properly carried through all steps
of the grievance procedure. . .    The jurisdiction of the
Arbitrator and his decision shall be confined to a determination
of the facts and the interpretation or application of the
specific provision or provisions of this agreement at issue.
The Arbitrator shall be bound by the terms and provisions of
this agreement and shall have authority to consider only
grievances presenting solely an arbitrable issue under this
agreement.   The Arbitrator shall have no authority to add to,
subtract from, modify or amend any provisions of this agreement.

. . .

#### BACKGROUND

In this background undisputed facts are summarized.   Where
evidence relating to the existence or non-existence of a
particular fact conflicts, the evidence is summarized.   The

grievance was filed on June 1, 2004, at the Dothan, Alabama, facility of PEMCO World Air Services which is a PEMCO Aviation Group Company. The Company at the Dothan facility provides three services: conversions, maintenance, and modifications on commercial, private and military aircraft. The facility's principal customer is Northwest Airlines. The facility normally employs between 600 and 700 employees of whom about 440 are classified as direct or permanent employees and are members of the bargaining unit. The rest of the employees are temporary contract workers obtained from agencies, called contract houses. The principal contract house is Airplanes, Inc. About eighty percent of the work is scheduled and the Company knows well in advance when the aircraft is coming. However, about twenty percent of the work is unscheduled, or 'drop in.' This occurs with only two to four weeks notice and requires additional employees.

The use of temporary employees from Airplanes, Inc. has been going on since 1996. Temporary employees are on the Company's payroll (Company Exhibit No. 2). They are given an orientation and told that if they perform their work satisfactorily they will be offered direct employment. The temporary employees are constantly told that the Company is hiring and needs good mechanics. Their performance is evaluated each week. Temporary employees who desire direct employment

indicate their intentions on the Contract Employee Retention
form (Company Exhibit No. 1). In the last fourteen months 60
employees were hired in this manner. This form also has a
section for declining the Company's offer of direct employment.
Most of the temporary employees decline the Company's offer of
direct employment.

Danny Dossett, Chief Steward, testified that he had been
employed at this facility for twenty-four years; that he was
chairman of a zone committee and had participated in the last
negotiations; that the previous agreement (Joint Exhibit No. 3)
had a similar seniority clause with some exceptions; that in the
last negotiations the Company proposed a 120 day probationary
period and the Union proposed 10 weeks (Union Exhibit No. 1);
that the Union and Company compromised on a 90 day probationary
period; that Gaylon Allen, Grand Lodge Representative, who
negotiated the last several agreements presented the tentative
agreement to the local Union members and at that time told the
membership that if probationary employees worked 90 days and
then left the Company for 10 weeks and come back as a direct
employee they would already have served their probationary
period; that Union Exhibit No. 5 is an explanation of the
termination procedure that was given to the Union at Step 3 by
Andy Smith, Assistant Human Resource Manager; that there was a
long discussion during the last negotiations with Frank Tucci,

PEMCO President, who said he, 'could live with 90 days'; that

for two and a half or three years the Company went by the 90

days, that is, employees who left before or at 90 days would

stay out 90 days and then return to work; that now temporary

employees are leaving before 90 days and coming back after a

week or more and starting their 90 days again; that before the

2000 negotiations temporary employees would work for 70 days,

stay out for 70 days, and then return to work; that the Company

has lived up to other parts of the Agreement; that work at the

facility can fluctuate; that temporary employees are offered

direct employment; that Article IV, Section 3 means that if a

temporary employee returns to work within 90 days he gets credit

for his probationary time and becomes a direct employee with

full benefits; that every temporary employee is offered full-

time direct employment; that the Agreement says that temporary

employees would be out 90 days before returning but that

temporary employees are coming back sooner; that 'the temporary

employees makes more than we do'; that the Union wants the

language of the Agreement applied to temporary employees; that

temporary employees do not pay Union dues; that if temporary

employees accepted the Company's offer of direct employment they

would join the Union and pay dues.

Wilton Morgan testified that he has been employed for

thirty-three years at the facility; that he has been a Shop

Steward and that he was involved in negotiations in 2000; that during those negotiations the Company said they were having trouble with the 10 week probationary period; that the Union was sensitive to the Company's problem and compromised on a 90 day probationary period to allow the Company more time to keep a temporary employee; that there was no misunderstanding on how it would work; that the Union recognized the 'drop-in' aircraft problem; that the probationary period is not being handled correctly; that temporary employees who come back don't pick-up the time that they had already worked; that the Company said in negotiations that if they had to let people go after 10 weeks they couldn't get them back; that the Company didn't anticipate having to keep temporary employees more than 90 days; that the change gave the Company twenty more days to look at a possible permanent employee; that it was always understood that temporary employees had to be out for as long a time as they had been employed; that the Company can't deviate from 'the book.'

Janet Dawkins, Shop Steward, testified that she has worked at the facility for seven years in the tool crib; that employees have to come through her before they leave the Company to leave their tools and check out; that sometimes tools are lost or stolen and they pay for them; that Union Exhibit 6 is the clearance form; that in the past temporary employees worked ninety days and stayed out ninety days; that now the Company is

letting the temporary employees keep their tool boxes and they are coming back in a week; that the tool boxes are sealed when the temporary employees take them home or leave them in the plant; that tool boxes are left in the plant with the expectation that the temporary employee will be back.

James Battcher, Director, Human Resources, testified that he has been the Human Resources director in Dothan since January 2003; that the facility uses from 0 to 150 temporary employees at a time as mechanics; that there is a need for supplemental employees; that the principal source, since 1996, for temporary employees is Airplanes, Inc. and other contract houses; that the procedure has been the same since 2003; that when temporary employees get close to or at the 90 days they resign, are terminated, or become permanent employees; that some return within weeks, some in months and others later; that the Agreement doesn't say that temporary employees have to stay out 90 days before coming back but that the Union says it was a past practice; that the temporary employees have to stay out at least one payroll cycle for administrative reasons so they don't show up as still being on the payroll; that both the temporary employees and the direct hires receive a two-day orientation; that there  are two classes of employees coded on Company records; that D0 means direct employee and D7 means temporary/contract employee; that the temporary employees sign a

document indicating they are contract employees and that they do not receive benefits; that they are told at the beginning of orientation that the Company needs good mechanics, the Company is hiring and they could become permanent employees; that they are constantly told this and they are evaluated each week just as if they were new hires; that Company Exhibit No 1 is the form used to retain temporary employees who become full-time direct employees; that this form is submitted within 90 days and certified by the Human Resource Department; that the offer is made to every temporary employee if they perform satisfactorily; that most temporary employees, 95 percent, decline the opportunity and are terminated within 90 days; that the Company wants to hire the temporary employees as permanent employees; that the contract house understands this and doesn't charge the Company a fee if a temporary worker is hired as a permanent employee; that he is notified by the VP of Operations when the facility will need a certain number of mechanics and he submits an order to Airplanes, Inc., who keeps him informed as to how they are doing in recruiting enough temporary employees to fill the Company's order; that no bargaining unit employees have been laid-off, or lost hours of work, or been replaced by temporary employees; that the practice of using temporary workers is not meant to undermine the Union; that Article 4, Section 3 doesn't apply to temporary employees and was written to keep the Company

11

/2·

from paying benefits to temporary employees but the Company now needs these employees; that there is an advantage to the Company to bringing back temporary employees since they know the aircraft; that the Company doesn't request a particular temporary employee from the contractor; that if an employee comes from the Unemployment Compensation office they are not a temporary employee but a direct hire; that these employees do not get benefits during the 90 days; that the Company uses all means to recruit direct employees including placing ads in trade magazines; that a contract house is a last resort; that since the beginning of 2004 about 60-75 employees have come in as direct hires.

## POSITIONS OF THE PARTIES

### UNION

The Union contends that temporary workers who are rehired within 90 days should receive credit for their previous time worked as part of their probationary period.

The Union contends that some temporary employees return as temporary employees within a week or a month of their leaving the Company and are not staying out for the 90 day probationary period.

The Union contends that some temporary employees who leave take their tool boxes home or leave them in the facility knowing they will be returning shortly.

12

The Union contends that the past practice was for temporary employees to stay out of the facility for the same ten week probationary period before returning to the Company.

The Union contends that it recognized the Company's need in the last negotiations for a longer period of employment for the contract workers by compromising on a 90 day probationary period.

The Union request that Article IV - Seniority of the Agreement be followed by the Company.

**COMPANY**

The Company contends that it cannot hire enough direct employees to meet all of its' demand for workers.

The Company contends that some of the work comes in on short notice, cannot be scheduled over a long period of time and would be lost if temporary workers were not used.

The Company contends that it attempts to recruit new direct hires, would prefer direct hires, and offers all of the temporary workers, who perform satisfactorily the opportunity to become direct hires.

The Company contends that it constantly tells the temporary employees about permanent job opportunities in the Company and constantly evaluates them.

The Company contends that it does not request specific former contract workers from the contract houses.

13

The Company contends that there has been no adverse effects on the bargaining unit.

The Company contends that there is no intent to undermine the Union.

The Company requests that the grievance be denied.

### DISCUSSION

The issue before the Arbitrator is:  Did the Company violate Article IV, Seniority and if so, what shall be the remedy.

The Arbitrator upholds the grievance.

The Arbitrator's reasoning follows.

The issue before the Arbitrator raises the following question:

Should temporary employees who work 90 days be considered as having fulfilled their probationary period?

The Arbitrator is convinced that temporary contract employees who work 90 days, should be considered as having fulfilled their probationary period.  Temporary employees receive the same two-day orientation as new employees who are recruited by the Company as direct hires.  Temporary employees are on the Company's payroll (Company Exhibit No. 2), are supervised by the Company and evaluated every week.  Temporary employees are constantly being told by the Company that it is hiring and that the Company would like to have them as direct,

14

permanent, employees.  A Company witness also testified that all temporary employees who perform satisfactorily are offered permanent direct employment.

The Arbitrator is convinced that with regard to Article IV - Seniority (Joint Exhibit No. 1) Section 3(B) a temporary employee should also be considered as a probationary employee. Article IV - Section 3(8) says "In the event, however, that a probationary employee is rehired with ninety (90) days after separation, he will receive credit for his previous length of continuous service as probationary employee, provided said probationary employee worked at least one (1) month prior to said termination in the same occupational group that he is placed in at rehire."*

---

*The Arbitrator did not deal with additional issues raised by the Union and the Company during the hearing or in post-hearing briefs.

**AWARD**

*16.*

Having heard and read and carefully reviewed the evidence and argumentative material in this case, and in light of the above discussion, the grievance is upheld.

Dated:  April 26, 2005

Trevor Bain, Arbitrator
2537 Woodland Hills Drive
Tuscaloosa, AL  35405
Phone No. (205) 556-3743
Fax No. (205) 556-6404